The People of the State of New York ex rel. Michael Doherty, Relator, *v.* The Board of Police Commissioners of the City of New York, Respondent.

The People of the State of New York ex rel. Bernard Meehan, Relator, *v.* The Board of Police Commissioners of the City of New York, Respondent.

The People of the State of New York ex rel. John Hock, Relator, *v.* The Board of Police Commissioners of the City of New York, Respondent.

*Police commissioners of New York — review of their dismissal of members of the police force — presumption indulged in its support — the testimony of an accomplice must be corroborated — testimony of the accused falsus in uno falsus in omnibus — notice of the charges preferred — jurisdiction, how affected by malice towards the accused — several members tried together — practice regulated by the board — ordinary rules of evidence disregarded.*

In proceedings brought to review the action of the board of police commissioners of the city of New York in dismissing from the police force of that city a member thereof, the court will indulge in the same presumptions in support of such determination that it would in support of the verdict of a jury.

Although the decision of the board of police commissioners of the city of New York, dismissing a person from the police force of such city on the charge of bribery, cannot be sustained, if based alone upon the uncorroborated testimony of the person who gave the bribe, it is not essential that the corroborative evidence, which is necessary to sustain such determination, should consist of statements of other witnesses who testified directly to the same effect; there is another form of corroboration which may be equally effectual, furnished by proof of surrounding circumstances and conditions which harmonize with and support, in essential particulars, the direct testimony, showing a connection between the narrative told and the opportunities, and permitting inferences as to probabilities.

Where the board of police commissioners of the city of New York, upon the trial of a member of the police force before it, is justified in finding his testimony false in one respect, it is authorized to disbelieve his testimony in all respects.

It is the established rule that where an administrative body, of the character of the board of police commissioners of the city of New York, is clothed with the disciplinary power of punishment or removal, the question of the reasonableness of the time allowed for explanation or preparation to meet the charges preferred before such body rests, to a great extent, in its discretion, and the manner in which that discretion is exercised will not furnish a ground for a reversal of the decision of such body in the absence of proof that it was capriciously exercised to the prejudice of the person removed.

The jurisdiction of the board of police commissioners of the city of New York to hear and determine charges against police officers of such city cannot be defeated by an expression of belief by the person tried before such board on charges preferred, that certain members of the board of commissioners clothed with judicial functions will exercise the jurisdiction conferred by law upon it wrongfully through malice or corruption. Nor can he secure himself in office by challenging, on such grounds, two of the members of such board, and thus leave the board without a majority of its members to render a judgment or make a determination, if the members so challenged were not prohibited from sitting because of any statutory disability and had no direct interest in the controversy in a disqualifying sense.

Separate and distinct acts were charged against certain members of the police force of the city of New York before the board of police commissioners of such city, but they were alleged to be in pursuance of a common scheme, to wit, the protection of a house of prostitution from the penalties of the law through the action of officers charged with its enforcement, the price of such protection being charged at one time to have been paid to one of such officers in the name of the second, at another to the second and at another to the third, but uniformly in pursuance of the common purpose and understanding, and the result of the trial showed that the witnesses on the part of the People were substantially the same in each case, and the proof adduced against each officer was in nearly all substantial respects like that offered against the others; there was no statute in existence giving such officers the right to a separate trial.

*Held*, that the determination of the board of commissioners should not be reversed, upon a review thereof under a writ of certiorari, for the reason that such board refused the application of such police officers for separate trials.

The board of police commissioners of the city of New York is not a court, but an administrative body vested with disciplinary powers of punishment or removal; it is authorized by statute to regulate its own practice and procedure, and is not restricted by all the limitations of a court at common law.

The members of the board of police commissioners of the city of New York who render judgment dismissing a person from the police force of such city need not be present when the evidence is taken. The board may call for the defense of an accused officer before his accusers have been heard, and such a departure from the rules of evidence as would be fatal in a criminal trial may not justify the court in reversing a sentence of such board upon the review thereof by certiorari.

CERTIORARI issued out of the Supreme Court of the State of New York and attested on the 27th day of August, 1894, directed to James J. Martin, John C. Sheehan, Charles H. Murray and Michael Kirwin, as police commissioners of the city of New York, constituting the board of police of the police department of the city of New York, commanding them to certify and return to the office of the

clerk of the county of New York all their proceedings, decision and actions in regard to the removal or dismissal of the relators from the police force of the city of New York.

. *Abraham L. Fromme*, for the relators.

· *Francis L. Wellman*, for the respondent.

Parker, J.:

The relator Doherty insists that the evidence presented to the police commissioners was insufficient to sustain the findings of bribery made by them, and it becomes the duty of the court to inquire whether there was evidence tending to support the finding, and if there was, whether there was such a preponderance of proof against the existence of such fact as would make it the duty of the court to set aside the decision as against the weight of evidence? In support of their determination, however, the court will indulge in the same presumptions that it would in support of a verdict of a jury. (*People ex rel. Masterson* v. *French*, 110 N. Y. 494; *People ex rel. Hogan* v. *French*, 119 id. 493; *People ex rel. McAleer* v. *French*, Id. 502; *People ex rel. Coyle* v. *Martin*, 142 id. 352; Code Civ. Proc. § 2140.)

· The direct evidence of bribery consisted of the testimony of Augusta Thurow, who for some three and one-half years prior to this trial had been the keeper of a house of ill-fame. Her story was, in brief, that October 25, 1892, while the relator was captain of the precinct in which her house was situated, her premises were raided, and she was placed under arrest; that she pleaded guilty before the Special Sessions on November 2, 1892; was fined twenty-five dollars, which she paid, and was then discharged. After her arrest, but before the November election, she went to the station house, accompanied by her husband, to see the captain. It was early evening, and when she reached the station house her husband remained outside, while she went in and there saw Captain Doherty alone, and the witness describes what took place as follows:

"The Witness: I says, 'I have come to see you about my house;' he says, 'Have you been tried in Special Sessions?' I said, 'Yes.' He says, 'What was you fined?' I said, '25;' he says, 'I told them not to push you hard;' then after that I said that I

would like to run my house the same as everybody else did in the precinct, and he says, 'I will send my man Meehan around.' I told the captain that I had done business with Bissert, and he said, ' Meehan is a nice fellow and you will certainly get along with him.' "

A few nights later Mrs. Thurow said there was a large procession passing, and she was out in the street with some girls, when the wardman, Meehan, ran up to her and said : " Wait until after election and we will see whether Tammany wins, and then you will put out brooms and go right ahead in business, put brooms out of the door and sweep out the other party and go ahead in business." The day after election she bought the brooms at Luhr's grocery near by, fastened them openly on the door of her house, and then the house was opened again for the conduct of the illegal traffic which had led to its being raided two weeks before.

The night after the election she says that Meehan came into the hall of her house, and the girls having told her of his coming, she went to him in the hall, and Meehan said : " I see you have commenced business, and I said ' Yes, what is the damage,' and he says $25, and I gave it to him."

She told him to call between the sixth and tenth of the month, and it was between those dates in the following month of December that she next saw him, at which time she handed him twenty-five dollars in front of the grocery store of Mr. Luhr. It was dark and no one was present, nor was anything said.

She never paid Meehan after that, and did not see him again except on the evening of January sixth, when she saw him standing in the station house in company with another man and four women as she passed into the captain's room.

She states the facts which led up to her visit to the captain on that occasion as follows : The inmates of her house had on that day been celebrating the birthday of a girl known as Lillie Sanders, and in the midst of the celebration a tall man with very light or white hair, called at the place and asked to see the witness, and when she came to him he said : " You want to go down to the house ; the captain wants to see you," and told her to go in the evening between the hours of eight and nine.

Between those hours, accompanied by her husband, she went to the station house. Her husband waited outside while she passed into

the captain's room. She describes the interview which took place between herself and the captain as follows : "A. I went in and I said to the captain, ' Did you send for me ?' and he said ' Yes.' I says, ' I have brought the money with me,' and he says, ' I am not supposed to take money,' and he handed me an envelope out of his desk and says to me, ' Write on that, Hock,' and I says, ' That is German,' and he says, ' Yes.' He says, ' Now, I am supposed to close the houses in my precinct,' and he had a bunch of papers, similar to those of the other man, and he opened it and showed it and showed me where the number of my house was, and he put his hand on the other part of it so that I could read my number, but nothing else on the other side, and he says, ' Now, you want to be very careful in doing business ; you only want to let your friends in and don't take any money yourself ; if you let strangers in they might send somebody from the central office, and they might raid you from the central office.' "

She wrote the name of Hock, as directed by the captain, and put the money inside of the envelope, the captain placing it in a pigeon hole in his desk.

The next day, she says, she read in a newspaper that Meehan was no longer the wardman of the precinct; that he had been transferred January twenty-sixth to another district, and Hock had been appointed precinct detective in his stead.

In the early part of the following month of February the witness was informed by some of the inmates of her house that, during a brief absence, Hock had called, so she went again to the office of the captain, and what took place she describes as follows : " A. I says to him, ' Captain, did you send Hock,' and he says, ' I could not send anybody else.' I says, ' I was not there when he went into the hall, and the girls told me that Hock was there, so I knew it was time for the money and I brought it with me,' and he gave me an envelope and I put it in and he put it in the pigeon hole. Q. Then you told him that the girls had told you that Hock had been there in your absence ? A. Yes, sir. Q. Was anything else said after you had given him the money ? A. Yes, sir. Q. What was it ? A. I says, ' I don't know Hock,' but he says, ' Well, the girls all know him ; he has been long on the Bowery.' I said that I did not know Hock ; that I did not know him personally."

She testified that her first direct and personal dealing with the new wardman took place in the early part of the following month of March. A little boy came to her and said that a man wanted to see her, and she immediately walked across the street to Luhr's store, where the man was standing, and, aided by the description which had been given of him by the girls, she handed him twenty-five dollars and went away. She made a similar payment to him in April, but in May he wanted five dollars for himself. Against this latter payment she protested, but Hock said, "That place is worth $60 or $70 to protect that ranch of yours. * * * The house is in the right spot and it is in the right neighborhood; make all you can get out of it." Finally, she says, she gave him the five dollars for himself, and as he took it he said, "You are a caution; there ain't one of them that hangs back that way with the money like you."

She testified to similar payments to Hock in June, July and August. In September she says that her husband came to her and reported that Hock was in the house, and she gave him the thirty dollars and he handed it to Hock in her presence.

In October and November she made similar payments, but in the middle of the latter month her house was raided for the second time, the first occasion having been a little over a year before. At the time of this raid she was arrested and brought before the Special Sessions, where she pleaded guilty and paid a fine of twenty-five dollars which was imposed. After her discharge she sought the wardman out again, and she says that he made a proposition to her, which involved the payment of a much larger amount for protection for the ensuing year. She in turn proposed the payment of a smaller sum than Hock had insisted upon, and requested him to submit to the captain her proposition, and Hock promised that he would come up again and let her know what the captain said. He did not come again, but she saw him shortly afterwards and inquired of him what the captain had to say about the arrangement she had proposed.

To this inquiry Hock made no answer, but said: "Well, First street is going to be closed up to-night, and you will have to lay low for thirty days or two months. You cannot do anything, because everything in First street and in the whole precinct is going to be all closed up. The Parkhurst people have been in to see the cap-

tain." Shortly afterwards Captain Cross succeeded the relator in command of the precinct and her house was raided.

But, urges the counsel for the relators, this story of corruption by a keeper of a house of prostitution was uncorroborated, and, therefore, insufficient to support the findings of the police commissioners. If it was essential that the corroborative evidence should consist of statements of other witnesses who testify directly to the same effect, the position of counsel would be well taken. But there is another form of corroboration, which may be equally effectual, furnished by proof of surrounding circumstances and conditions which harmonize with and support, in essential particulars, the direct testimony, showing a connection between the narrative told and the opportunities, and permitting inferences as to liabilities.

In *People* v. *Elliott* (106 N. Y. 288) the court considered whether the corroborative evidence in that case was sufficient to meet the requirements of section 399 of the Code of Criminal Procedure, forbidding a conviction upon the testimony of an accomplice, unless " corroborated by such other evidence as tends to connect the defendant with the commission of the crime." There was no direct evidence connecting defendant with the crime other than that of the accomplice. The evidence offered for that purpose showed that the defendant had been previously convicted of a like crime; that he and the accomplice were acquaintances and associates in the city of New York; that he was in Rochester, the place where the crime was committed, and at Charlotte, a place near Rochester, some days prior to the commission of the crime, and registered at three hotels under an assumed name; that the accomplice was with the defendant at Charlotte and was introduced by him to a third person; when arrested, he asked the officer if any one had been arrested in Rochester; and, upon being asked why, he said there must have been somebody who had done some talking, and, while denying that he had committed the crime, said he knew who did it. The court, in holding that there was sufficient corroboration to sustain the conviction, said : " All these circumstances certainly have some tendency to corroborate the evidence of the accomplice, and they seem to us to satisfy the requirements of the section of the Criminal Code referred to. Each circumstance, taken by itself, is quite inconclusive, but when considered together they certainly furnish some cor-

roborative evidence. It is not necessary that the corroborative evidence of itself should be sufficient to show the commission of the crime or to connect the defendant with it. It is sufficient if it tends to connect the defendant with the commission of the crime."

In *Moller* v. *Moller* (115 N. Y. 466), which was an action for divorce, the defendant invoked the rule, established by the courts, that the uncorroborated evidence of prostitutes and private detectives is insufficient to break the bonds of matrimony.

The court, while approving the rule, said : " But the illicit amours of faithless husbands and wives are usually clandestine, and their wicked paths are hidden from public observation; and, hence, courts must not be duped, and they must take such evidence as the nature of the case permits, circumstantial, direct or positive, and bringing to bear upon it the experiences and observations of life, and thus weighing it with prudence and care, give effect to its just preponderance." Other recent cases in which this general rule has been applied, are *People* v. *Terwilliger* (74 Hun, 310, 313) ; *People* v. *Hooghkerk* (96 N. Y. 149, 162) ; *People* v. *Everhardt* (104 id. 591) ; *People* v. *Oogle* (104 id. 511, 515) ; *People* v. *Jaehne* (103 id. 182) ; *McCarthy* v. *McCarthy* (143 id. 235).

Necessarily, there can be no direct evidence of the commission of an offense of the character of that of which the relator has been found guilty by the police commissioners, other than that furnished by one of the two parties to the transaction.

Receipts are not ordinarily given for bribe money, nor the presence of witnesses invited to see paid over the price of official dishonor.

But, while this is so, it is necessary that there should be some corroborating facts and circumstances harmonizing with the direct testimony which give to it such weight and strength as to induce belief in its truth.

We shall now inquire whether there were such corroborating facts as to authorize the police commissioners to find, as they did, that the story of the woman Thurow was true. One of the pregnant facts seems to be thoroughly established, outside of the testimony of Mrs. Thurow, and that is, that during the period for which she claims to have paid for police protection she was conducting a house of prostitution. It is equally as well established that the relator well knew that such was the fact. These facts are made to appear by evidence

entirely outside of the testimony of the inmates West and Sanders. It was in October, 1892, that the woman Thurow was first arrested. This relator had been the captain of the precinct from the early spring. During this time it appears that the women inmates of this house were actually detected by passing officers soliciting from the stoop. More than that, the officers frequently arrested some of the inmates and brought them before the magistrate, who, in some instances, imposed a nominal fine, which they paid. The relator's knowledge of the character of the house appears from his own testimony, as well as from other evidence consisting in part of a letter, dated June 23, 1892, written by him to Werner A. Meyer, the agent for the owner of the premises occupied by Mrs. Thurow as lessee. The letter is as follows :

"Precinct No 14,
"New York, *June* 23, 1892.

"Werner A. Meyer, Esq.,
　　　　"16 First street.

"Sir — I wish to notify you that the premises known as No. 23 Second avenue, of which I understand you are the agent, is now being used for immoral purposes. I have received so many complaints about it that I have procured the necessary evidence against the place of Mrs. Thuro. I would advise you to take such action as would save the owner from being prosecuted.

　　　　　　"Respectfully,
　　　　　　　　"MICHAEL DOHERTY,
　　　　　　　　　　"*Captain 14th Precinct.*"

What action the agent took in the matter we are not informed, but certain it is that the captain took no steps in the direction of closing the house for nearly four months thereafter, when the premises were raided and Mrs. Thurow placed under arrest. She pleaded guilty to the charge of keeping a disorderly house, and paid a fine of twenty-five dollars. Without referring to other testimony in the record on this subject, we may safely say that her testimony as to the character of her business, and the captain's knowledge of it, prior to the time when she alleges she commenced to pay for protection, is fully confirmed.

The arrests of women from her stoop ; the captain's letter to the agent ; the raiding of the house under his direction ; the arrest of

the woman Thurow; the charge against her and her plea of guilty, assured the police commissioners, not only of the character of her business, but that the captain had full knowledge of it. That it is an important fact is apparent, when we consider that almost immediately after she had paid the fine and been discharged, she went on with the business the same as before, and was not again arrested or her house raided for more than a year. The reason that she gives, for the cessation of hostilities on the part of the police, was that she paid for protection.

The fact that, immediately after her arrest, she was permitted to go on with her business in the same manner as before, and to continue it for so long a period of time, with knowledge on the part of the captain of the precinct that her business was being conducted as formerly, certainly tended in the direction of confirmation. Evidence was furnished by the relator which permits inferences of fact corroborative of material portions of the testimony of the witness Thurow. Some of his witnesses testified that, day after day, during the months from June to November, 1893, the captain, in the hearing of the sergeants and of the whole platoon, directed that special efforts be made for the suppression of this particular resort. And, notwithstanding the pretended vigilance, the house was not raided nor was the woman Thurow arrested. Occasionally a woman from the house would be found on the outside soliciting, and in full view of the residents of the immediate neighborhood, and she was at once placed under arrest. But their arrest proved not to be a very serious annoyance for Mrs. Thurow, against whom the captain would have it believed the police were not only daily warned but whom they were commanded to bring to justice, for as promptly as her women were arrested she was accepted as bondswoman by the sergeant in command.

It is certainly a fact of such moment as to entitle it to serious consideration that this woman should have been accepted as bondswoman for the inmates of her house on the very days on which the captain was commanding vigilance on the part of his force, to the end that the woman Thurow and her illegitimate business should be driven from the precinct. The witness Thurow says that she arranged with the captain to have herself accepted as bondswoman

for the inmates of her house when arrested, "just the same as Mollie Burns," another keeper of a house of prostitution, was accepted. The blotter kept at the station house, and which is required to be signed by the captain five times each day, shows that Mollie .Burns was frequently accepted as bondswoman. It further appears from this blotter that there was before the relator, as captain, a record, which it was his duty to sign on five different occasions during the day, which should have informed him, and doubtless did, of the fact that the woman Thurow was being accepted as bondswoman for the inmates of her house by his sergeant, and that the effect of such action was to make their arrests a farce. The fact that she was so accepted on many occasions, and that it was made to appear upon the blotter, which it was the captain's duty to examine, was entitled to consideration in connection with her statement that she was so accepted in pursuance of an arrangement with the relator, and the commissioners were at liberty to draw the inference that such fact tended to corroborate her story. And the captain's wordy vigilance. to his command, considered in connection with the fact that during all this time no results were accomplished, and no efforts made in that. direction, other than the arrests of the women while on the stoop or street, and which occasioned them no other trouble than the production of Mrs. Thurow to sign a bond, constituted evidence which the commissioners could weigh in determining whether they tended to corroborate Mrs. Thurow's assertion that such official neglect of duty was in accordance with a corrupt agreement made with her. In matters of detail her story was not without corroboration. The captain strenuously denies that the conversations to which Mrs. Thurow testified ever took place between them, or that any money was paid to him; but he does say that she called at the station house on two occasions. They differ radically as to what took place. The captain says that on these occasions, "I told her she was a desperate woman, and I said, 'You get out of this precinct and get out of this station house.'" But the fact that this woman was in the station house and in the captain's room was a matter for consideration on the question of corroboration.

The testimony of the husband Thurow confirmed that of the witness in several respects. He testified that, on one occasion, he saw her hand money to Hock, and, on another, that she handed the

money to him to give to Hock, and that he did it in her presence, and in this respect their statements are agreed.

He confirmed her statement that he accompanied her to the station house, and says that on one of the occasions he went into the private room and shook hands with the captain. Luhr, the proprietor of the neighboring grocery, knew of the character of the house, and testified that he sold Mrs. Thurow brooms, and saw them fastened on the house. Of course, this corroborates her statement that she bought the brooms of Luhr, and took them to the house and fastened them upon the door.

The importance of this corroboration by Luhr is apparent, when it is brought to mind that only a few days before her house had been raided and she had been adjudged guilty of keeping a disorderly house.

From that time until the day after election she had been obliged to conduct her illicit business with some show of regard for outward appearances. How came it then that as soon as election day came and went she assumed that she no longer need keep up an outward appearance of obeying the law, but could at once openly advertise her business upon the door of her house, by hanging thereon a cluster of brooms, which seems to have been regarded as an appropriate and effective sign? She says that she took this step because just before election she was told by Wardman Meehan in effect that if the election turned out all right she could put out brooms and go right ahead in business. Now, if she did put out brooms the day after election, as Luhr swears she did, and with brooms bought from him, and within two weeks after her house had been raided and she arrested, convicted and fined, it constitutes an important fact for consideration in connection with her version of the conversation with Meehan on that subject.

The records of the department confirm the witness' statement that she did not see Meehan after January sixth, in the precinct, and that the papers the day following announced that he had been transferred and Hock appointed in his place. The witness Thurow's statement that the captain, in passing the house, would frequently address remarks to the inmates, who were on the stoop, and order them inside of the house, is confirmed by the women West and Sanders. The last witness admitted that January 6, 1893, was her

birthday, and that the event was celebrated by the inmates of the house. It was in the midst of this celebration that the witness Thurow claims to have been summoned to the station house, which, she says, was on the evening of January 6, 1893.

We have not overlooked the fact that the records kept at the station house seem to demonstrate that the captain was absent between eight and nine o'clock of the evening of January sixth; and it follows, necessarily, that Mrs. Thurow could not have seen him between those hours. But the records do show that the captain was present between seven and eight o'clock on that evening. It is entirely possible, therefore, that she might have made an error of half an hour or an hour as to the time of the meeting, and still have been correct in all substantial respects. This error was a fact to be considered in connection with all the other facts and circumstances bearing upon her alleged visit to the captain; but it was not a fact of such force and weight as to require of the commissioners that they wholly disregard all the other evidence relating to that meeting.

There are many other facts in this voluminous record which might be referred to in considering the question whether the record contains such evidence of a corroborative character as authorized the commissioners to consider it under the general rule expressed in *People* v. *Elliott* (*supra*): "The court, before it should submit the case to the jury, should be satisfied that there is some corroborative evidence fairly tending to connect the defendant with the commission of the crime, and when there is, then it is for the jury to determine whether the corroboration is sufficient to satisfy them of the defendant's guilt."

We think the evidence to which we have referred fully supports the commissioners in the conclusion necessarily reached by them, that the facts offered in corroboration were of such a character as to be entitled to consideration in connection with the direct testimony of the witness Thurow.

It follows that if the corroborating facts and circumstances persuaded the commissioners that Mrs. Thurow's testimony was true, their finding must stand, unless the evidence presented in behalf of the relator so preponderates against it as to make it the duty of the court to set aside the finding, because it is against the weight of evidence.

It is urged in behalf of the relator that, even though it be determined that there was sufficient evidence of corroboration to justify the belief in Mrs. Thurow's story, in the absence of direct evidence to the contrary, still there was produced in behalf of the relator direct and positive evidence to the contrary in such measure as to make it the duty of the court to hold that the findings should be reversed because against the weight of evidence.

Hock, Meehan and the relator Doherty all specifically and positively denied the statements of Mrs. Thurow. But it cannot be said that their testimony was not in some degree discredited by the searching cross-examination to which they were severally subjected.

From the relator Doherty's testimony it appears that he was appointed patrolman in December, 1870, at a salary of $1,200 a year; promoted to the post of sergeant in July, 1887, when his salary was increased to $1,600 and later to $2,000, and was appointed captain in 1890 at a salary of $2,750. He was married in May, 1875; at the time of the trial had a family of eight children, the eldest of whom had attained the age of sixteen years; was then living at 735 Lexington avenue, which he purchased in December, 1893, for $18,000; $4,000 was paid down in cash at the time of purchase, and a mortgage for $14,000 on the property was paid by him within two months after the purchase. At the time of the trial he had other property in Mount Hope, for which he had paid $2,000; some real estate in Brooklyn, for which he had paid a like sum, and a balance to his credit, in the Farmers' Loan and Trust Company, of between $5,000 and $6,000. When asked to explain how he had been able to support so large a family and accumulate a fortune of $28,000 on a salary which was only $1,200 a year until 1887, and at no time more than $2,750, he said that in December, after he had been appointed sergeant, a broker named Gustave Tuttle came to him while he was on a patrol wagon and said: "It is a good time now if a person had a few hundred dollars, it was a beautiful time in stocks." I said — we entered into conversation about it, and he said, "If a man had a couple of hundred dollars now he would make a big thing on it." I said, "I have a couple of hundred dollars and more than that if there is any chance, but don't use my money and lose it." Well, he said, "I would not use your money if I did not think there was a pretty sure thing. He

said, "If you trust me you will see." I went down to the station house, and, as I stated before, I kept my money, a good deal, in the station house and at home; I could have given him a thousand dollars there out of my closet at the station house at the time. I could have given him it at the time. I brought out $200 and I gave it to him. Now, about two or three days after, two days, I should think, he came to the station house to me, and I was on desk duty, and he gave me $1,200 and my $200; he says I was lucky enough; I says, "You were; this is my first experience in stocks, I said; and I said, I am very lucky." I took my $200 from it and I gave him back the $1,200; and I said, "I have lost nothing now, I have my $200 clear, you take that $1,200 and use it the best you can for me in stocks, and from time to time he won, got money for me. He gave me $2,600 at one time. During the next five months he gave me at different times, or he won $22,000 for me, and that was the luckiest part of my life only when I was made police captain, of course I was lucky then."

Further cross-examination discloses that he had never made inquiries as to the whereabouts of the broker's office; had never received a statement as to the shares of stock which had been purchased or sold; did not think his broker kept any books of any kind, and knew of no writing of any nature which would substantiate the story of the dealings between the broker and himself. When asked for Mr. Tuttle's address he said: "I have not it just now; I think I can find him around the Sinclair House." Apparently he did not find him, for Tuttle was not produced on the trial. As this money came to him, according to his testimony, some time in June, 1881, inquiry was made as to its disposition, upon the assumption that such a large sum of money would likely be either invested or deposited in some financial institution. But, according to the witness' testimony, the accommodating broker, who had made $22,000 for him on an investment of $200 during a period of five months, consented to borrow it of him and pay him interest at the rate of six per cent. The loan was made, according to the witness, and a note or notes, he did not remember which, without other security, was accepted. When the note or notes were payable he did not remember, but recalls that they were subsequently paid by his benefactor, the last payment being made some time in the latter part of 1892.

It is impossible to read the testimony of the relator upon this subject, to which we have been able to make only a brief reference, without reaching the conclusion that the commissioners were at liberty to disbelieve his story as to the manner in which this sum of $22,000 was accumulated.   If they found his testimony to be false in such respect they were, of course, authorized to disbelieve it in all respects.   In this record of 800 pages we have found evidence tending to discredit other witnesses who testified in behalf of the relator.   But as this discussion has already proceeded to an unreasonable length we shall refrain from its consideration and content ourselves with the assertion that our examination satisfies us that the finding which we have been considering cannot be set aside on the ground that it is against the weight of evidence.

We are also of the opinion that there was such evidence in support of the finding that the relator was guilty of culpable neglect of duty, in permitting Mrs. Thurow's house to be maintained for illegal and immoral ends from the 6th of January, 1893, to the month of November following, as to deny to this court the right to reverse it.

The relator was required to go to trial upon two days' notice, notwithstanding a request for an adjournment, and it is urged that the denial of the request was error.   The statute provides that charges against a member of the department shall be investigated " upon such reasonable notice to the member or members charged, and in such manner of procedure, practice, examination and investigation as the said board of police may, by rules and regulations, from time to time prescribe."   (Chap. 410 of 1882, § 250, as amended by chap. 180, Laws 1884, § 1.)

And the one hundred and eighty-ninth rule of the department provides that service shall be made two days before the trial, which rule was observed in this case.   The request of the relator, therefore, was for an adjournment after being regularly brought before the board upon such notice as the rules prescribed.

It is the established rule that where an administrative body of the character of the board of police commissioners is clothed with the disciplinary power of punishment or removal, the question of the reasonableness of the time allowed for explanation or preparation to meet the charges, rests to a great extent in the discretion of such

body, and the manner in which that discretion is exercised will not furnish a ground for reversal of the decision, in the absence of proof that it was capriciously exercised to the prejudice of the relator. (*People ex rel. Keech* v. *Thompson*, 94 N. Y. 451.)

The counsel for the relator strenuously insisted before the commissioners that the interests of his client required an adjournment to prepare for the hearing, while, on the other hand, the counsel for the People, with apparently equal earnestness, urged that there were public reasons why the trial should at once proceed, alleging, among other reasons, that the witnesses for the prosecution were under constant and vigilant surveilance, and that a prompt inquiry was indispensable if one was to be prosecuted at all. In this situation the commissioners decided to refuse an adjournment, and this court is not at liberty to say, in the light of the facts before the commissioners, that they abused the discretion vested in them.

Relator's further contention, that it was error for two of the commissioners to sit after they had been challenged by him and accused of having prejudged the case, and not intending to give the accused a fair trial, is without legal merit. The board of police commissioners consists of four members, and under the statute empowering them to investigate, take evidence and hear charges against members of the police force, and to render judgment dismissing, removing or suspending members of such force, it is provided that no such judgment or other determination shall be rendered " unless a majority of the board of police commissioners shall concur." (§ 251 of said act of 1882, as amended by chap. 180 of 1884.) As the board has exclusive jurisdiction in such matters it would follow, if relator's position be well taken, that he could secure himself in office by challenging two of the members of the board, as he attempted to do in this case, thus leaving the board without a majority of its members to render a judgment or make a determination.

It is not pretended that the commissioners whom he attempted to challenge had any direct interest in the controversy in a disqualifying sense, or that they were prohibited from sitting because of any statutory disability, and in such a case jurisdiction to hear and determine cannot be defeated by an expression of a litigant's belief, that the judge or officer clothed with judicial functions will exercise the jurisdiction, by law conferred, wrongly through malice or corruption.

The trial of the accused jointly, notwithstanding their request for a separate trial, is claimed to be error. The reasons assigned for a right to a separate trial are stated by the relator in these words: "The charges do not affect the defendants equally; Meehan is accused in the months of November and December, 1892; the captain, in January and February of 1893; Hock, from March, 1893, to November, 1893, all of bribery, the charges of neglect of duty differing both as to dates and responsibility, the extent of vigilance differing as to commander and subordinate, and the amount of official business, being the tests as to willful neglect, differing in like manner."

It should be further observed that, while separate and distinct acts were charged against the accused, they were nevertheless alleged to be in pursuance of a common scheme, to wit, the protection of a house of prostitution from the penalties of the law, through the action of officers charged with its enforcement. The price of protection was charged at one time to be paid to the captain in the name of his wardman; at another to the first wardman, and at another to the second, but uniformly in pursuance of a common purpose and understanding. The result of the trial has shown that the witnesses on the part of the People were substantially the same in each case, and the proof adduced against one was in nearly all substantial respects like that offered against the others. There was no statute in existence giving the relators the right to a separate trial, and inasmuch as the ground work against all the relators was the same, the determination of the commissioners should not be reversed, unless there is some rule of law which entitled them to separate trials. The relator has not brought to our attention any authority asserting the existence of such a rule. On the other hand, authority is not wanting that the board which tried these relators is not restricted by all the limitations of a court at common law, for it is not a court, but an administrative body vested with disciplinary powers of punishment or removal, and authorized by the State to regulate its own practice and procedure.

In *People ex rel. Weston* v. *McClave* (123 N. Y. 512), upon a hearing before the commissioners upon charges against a member of the force, the accused was sworn upon the opening of the case,

and asked to state what occurred at the time of the commission of the alleged offense.

Counsel at once objected that no case had been made out against the accused, and that he could not be called upon to testify against himself before a case had been made out against him. The objection was overruled, and the Court of Appeals in sustaining the ruling of the commissioners said: " But the proceedings of the board of police commissioners are not governed by any particular rules of procedure other than their own. The statute (Chap. 180, Laws 1884) authorizes the board to adopt rules for the examination, hearing and determination of charges against members of the force. It guards the rights of the accused member by providing that the charges shall be in writing, and shall be investigated upon a reasonable notice to him. This power to regulate the manner of procedure in the trial of an accused member, is, in the nature of things, reasonable, and strict conformity with the mode of procedure in courts of law is not expected nor essential. The proceedings are disciplinary in their nature. For the maintenance of the police force in the most efficient state possible, especial powers are conferred upon the commissioners by the statute, and great latitude is allowed them in the exercise of these powers. The tenure of the policeman's office must necessarily be dependent upon his implicit obedience to the disciplinary rules which his superiors establish, and though entitled to a trial upon any charge involving subjection to punishment, that trial is, practically, simply an examination of the matter, whereat the accused can be present and be heard in defense or excuse. Such an examination is not like a trial in a court of law, and for its legal correctness it is only required that no rule of law shall have been violated nor unwarrantable punishment be inflicted."

So, in *People ex rel. McCarthy* v. *The Board of Police* (98 N. Y. 333) a patrolman was dismissed from the force upon evidence taken before one of the commissioners, sitting alone. Before a determination was had such commissioner went out of office, and thereafter the evidence was submitted to the four commissioners then in office, who made the determination complained of. The court held that no error was committed, and, in the course of its opinion, said: " This was not a common-law trial, with the incidents and common-law rights pertaining to such a trial, nor, strictly speak-

ing, was it a trial before a court. It was an investigation required by the statute in such cases to furnish information to the board upon which they can act in disciplining any member of the police force." Other authorities tending in the same general direction are *People ex rel. Cline* v. *Robb* (126 N. Y. 180); *People ex rel. Flanagan* v. *Board of Police* (93 id. 97); *People ex rel. Keegan* v. *Purroy* (4 N. Y. Supp. 345).

By these cases it is determined that the commissioners who render the judgment need not be present when the evidence is taken; that the board may call for the defense of an accused officer before his accusers have been heard; that such a departure from the rules of evidence as would be fatal in a criminal trial may not justify the court in reversing a sentence of the board of police commissioners, and it would seem to follow from the line of reasoning which led to these decisions that the commissioners were clothed with the discretionary power of determining whether these relators should be separately or jointly tried. We have discussed only the relator Doherty's case, but have necessarily reached the same conclusion in the cases of Hock and Meehan, the ground work of the evidence in each case being substantially alike.

The writs of certiorari should be dismissed in each case, with costs to the respondent.

Van Brunt, P. J., and Follett, J., concurred.

Writ dismissed in each case, with costs to the respondent.