PEOPLE ex rel. DEVERY v. MARTIN et al., Police Commissioners.

(Common Pleas of New York City and County, General Term. June 3, 1895.)

1. POLICEMEN—DISCHARGE—CERTIORARI TO REVIEW.
   On certiorari to the board of police commissioners, the general term has jurisdiction to review a decision of the board denying an adjournment of the trial of a policeman.

2. SAME—REFUSAL TO POSTPONE HEARING.
   If such refusal to adjourn was so clearly against the proof of the policeman's illness and inability to·attend as to show an abuse of discretion, his conviction in his absence, and unheard, is a trial without an opportunity to defend; and such conviction will be set aside, and the policeman reinstated.

(Syllabus by the Court.)

Certiorari by William S. Devery to review the decision of James J. Martin and others, constituting the board of police commissioners of the city of New York, in dismissing relator from the police force. Commissioner John C. Sheehan voted against the dismissal, on the ground that relator was unable to be present at the trial.   Reversed.

Argued before BOOKSTAVER, BISCHOFF, and PRYOR, JJ.

Edward C. James and Abm. I. Elkus, for relator.
Francis L. Wellman, for respondents.

PRYOR, J.   In compliance with a writ of certiorari out of this court, the respondents make return of their proceedings upon the trial and conviction of the relator of offenses, the commission of which, if legally ascertained, justifies his dismissal from the police force.   The relator challenges the validity of the sentence of dismissal upon two grounds:   First, that he was denied an opportunity of appearing and making defense to the charges of which he is found guilty; and, secondly, that the evidence, though uncontroverted, is insufficient to sustain the conviction.

The question to be determined by this court on the return of the writ is whether the board of police commissioners, in the conviction and dismissal of the relator, violated any rule of law affecting his rights, to his prejudice.   Code Civ. Proc. § 2140, subd. 3; People v. Hildreth, 126 N. Y. 360, 364, 27 N. E. 558.   That the relator was entitled, of right, to make defense to the accusations upon which he was arraigned—involving his personal presence at the trial, the con-

fronting of witnesses against him, and the production of evidence in his behalf—is a fundamental and inviolable principle of law.

"It is a rule founded on the first principles of natural justice, older than written constitutions, that a citizen shall not be deprived of his liberty or property without an opportunity to be heard in defense of his rights, and the constitutional provision that no person shall be deprived of these without due process of law has its foundation in this rule. This provision is the most important guaranty of personal rights to be found in the federal or state constitution, and it extends to every case which may deprive a citizen of life, liberty, or property, whether the proceeding be judicial, administrative, or executive in its nature." Stuart v. Palmer, 74 N. Y. 183, 190.

Hence, an assessment by commissioners was annulled, for want of opportunity to the property owner to be heard upon it. Similarly, in People v. Gilon, 121 N. Y. 551, 558, 24 N. E. 944, where a board of assessors gave notice of an assessment upon the property benefited, but none as to a hearing in regard to damages, upon certiorari the court of appeals vacated the determination of the board for the reason that in making the award it "failed to observe an essential requirement in all judicial proceedings, namely, notice to the party interested in the determination, and an opportunity to be heard." Independently, therefore, of statute, opportunity to be heard and make defense was the inviolable privilege of the relator. But, out of abundant caution, the legislature has expressly provided—

"That no member of the police force shall be removed or dismissed until written charges shall have been made and preferred against him, nor until such charges have been examined, heard, and investigated upon such reasonable notice to the member charged."

Accordingly, in People v. French, 119 N. Y. 502, 23 N. E. 1058, the court of appeals held that:

"The members of the police force of the city of New York have a permanent tenure of office, and cannot be dismissed until after charges have been preferred, examined, heard and investigated, as provided by the statutes and the rules adopted by the board of police commissioners."

Again, in People v. McClave, 123 N. Y. 512, 516, 25 N. E. 1047, the court say:

"The commissioners prescribe rules for the government of the force, and by which the personal and official conduct of its members shall be regulated. They are empowered to punish a member who is guilty of an offense, * * * and the only limitations upon their disciplinary powers is the express one: that a trial shall be had upon written charges, * * * and the implied one: that that trial shall be a proceeding fairly conducted; that the decision shall be based upon evidence of the truth of the charges, and that no immunity or privilege secured to the accused by the law of the land shall be violated."

In the order adjudging the charges against the relator to be true, and dismissing him from office, it is alleged that he "appeared and answered at the time and place required by said notice"; that the charges were "duly brought to a hearing, and duly tried, heard, publicly examined, and investigated in the manner required by law and the rules and regulations of the said board"; and that the relator was "afforded a full opportunity to be heard in his defense." The statement that the relator "appeared and answered at the time required by said notice" is absolutely without foundation. In their return to the writ the respondents suppress the facts of the case.

They say merely that notice of the charges and of the hearing was served upon the relator on the 6th of August, 1894, and that thereafter, on the 15th of August, he appeared by his attorneys, and the trial proceeded. The truth is that on the 6th of August the relator was cited to appear on the 9th for trial; that apprised on the 8th of his inability to be present, by reason of illness, the board adjourned the trial indefinitely; that on the 13th of August the trial was set for the 15th; that, for causes hereafter appearing, notice of the trial on the 15th was not communicated to the relator, and he was not aware of it until long after the event. And yet, from the return, the obvious and inevitable inference is that the relator was admonished on the 6th of August of his trial on the 15th. On the 6th, says the return, the relator had notice of the charges, and the time of trial, and "thereafter, on the 15th of August, at the time mentioned," the trial proceeded. By omitting the time mentioned in the notice of the 6th, namely, the 9th, the idea is conveyed that the 15th was the day designated in the notice of the 6th, and that so the relator was duly apprised of the trial. Equally misleading and unwarranted is the statement in the order of dismissal that the relator "appeared and answered." From these words the inference is that he appeared in person, and made answer to the charges. He did neither. He appeared only by attorney, not attorneys; and he appeared for the exclusive purpose of procuring an adjournment of the trial because of the illness of his client, and, the adjournment denied, he took no further part in the proceeding. With exquisite art, counsel for the prosecution endeavored, over and again, to beguile the relator's attorney into some act that would be equivalent to a participation in the trial; but, with equal adroitness and persistency, the attorney kept aloof from the proceeding, except to move an adjournment.

The question is, had the relator opportunity to be heard and defend at the trial on the 15th of August? The respondents urge that we have no jurisdiction to review their decision in the refusal of an adjournment of the trial; and they cite People v. Board of Police Com'rs (Sup.) 32 N. Y. Supp. 18, in support of the contention. But the point there adjudged, on application for a suspension of the trial, was that:

"The question of the reasonableness of the time allowed for explanation and preparation to meet the charges rests, to a great extent, in the discretion of the board; and the manner in which the discretion is exercised will not furnish a ground for reversal of the decision, in the absence of proof that it was capriciously exercised, to the prejudice of the relator."

In People v. Thompson, 94 N. Y. 452, the power of revision is conceded, where it appears "that the discretion has been abused." Regarding the request of the relator as for an adjournment, merely, we should not hesitate to hold that, upon the evidence presently considered, the denial of the application was capriciously exercised, and the discretion of the board abused. But, while the application was in form for a postponement of the trial, it was in effect a demand for a trial in the legal sense; that is, for a trial in which the accused might be present and make defense. Prostrate and power-

less by physical illness and mental malady; unable to attend, and incompetent to defend,—the alternative presented to the relator was either to be condemned unheard, or to obtain an adjournment. The adjournment was denied, and he was convicted without a trial. By section 2140, subd. 3, of the Code, the violation of any rule of law affecting the rights of the relator, to his prejudice, is reviewable on certiorari. The right to be heard and make defense was his primary and supreme right, standing at the threshold of the trial, and, in its denial, involving a refusal of all his rights. No trial is more detrimental, even, than a trial in which auxiliary rules for the protection of the accused are disregarded. In the denial of a trial, all the rights of the relator were annihilated at a blow. But counsel for respondents argues that the relator was not prejudiced by the failure to defend, because the offenses proved justify his dismissal. How proved? By denying relator the privilege of defending; of cross-examining witnesses, and adducing evidence in disproof of the charges. From such an ex parte inquisition, angelic innocence might not escape. The refusal of the adjournment— that is, the denial of the trial which the law guaranties—was of prejudice to the relator, and no court will listen a moment to a contrary contention.

If, however, the relator was not ill and incompetent on the 15th of August; if, as the respondents insist, the illness and incompetency he affected was a sham and a fraud contrived only to defer the trial, while in fact he was able to attend and make defense,—then, in law, he has not been condemned unheard, and we must ratify his sentence of dismissal. And this question is open to our review, not only as involving a violation of right, but by subdivision 5, § 2140, of the Code, which authorizes us, on certiorari, to reverse a finding of fact because contrary to the preponderant proof. In the return these facts appear, without contradiction: That on the 27th of July, 1894, after official examination by a police surgeon, the relator was reported ill and unfit for duty; that he was thereupon excused from duty, and has not since been ordered on duty; that no inquiry was then made, as provided by the rules of the department, to ascertain whether his sickness was real or pretended; that, on a report by the surgeon of his illness to the board, his trial, set for the 9th of August, was indefinitely postponed. Thus was the illness of the relator accepted as a fact by the board, and deemed so serious as to excuse him from duty, and exempt him from trial. How happened it, then, that five days afterwards, on the 13th, he was suddenly summoned for trial on the 15th? It is said that the illness of the relator was feigned to avoid a trial of the charges against him. But he was ill on the 27th of July, and the charges were not served until the 6th of August; and, when served, he exclaimed, "My God! I did not expect this so soon." This involuntary ejaculation, testified to by the man who made the service, is significant of the relator's surprise at the imminency of his trial, and precludes the presumption that he was shamming sickness to elude it. Indeed, the same witness (he appeared for the prosecution) confessed that

the relator was not expecting the summons for trial. That his illness was a pretense, premeditated to avert the trial, rests on nothing stronger than suspicion, and is discredited by uncontroverted facts. On August the 8th, Dr. Charles E. Nammack, a police surgeon, reported to the board (these respondents) that on the 7th he made "a careful physical examination" of the relator, and found him "unfit for duty, by reason of active congestion of the brain," and "mentally incapable of directing the conduct of his defense." This was the official certificate of their own subordinate, and was the evidence upon which they adjourned the trial. Again, on the 14th of August, Police Surgeons Nammack and Dexter, with Dr. Peterson, an eminent specialist, and Dr. Becker, relator's regular physician, made another examination of him, with the result that he was found to be still ill, and incompetent for duty or mental action. Nevertheless, the board, denying the motion for an adjournment, proceeded to try the relator, and in his absence, and without defense made, found him guilty upon each of 56 charges, and sentenced him to dismissal from the service. Now, what was the evidence upon which the board refused the adjournment? In favor of the adjournment, relator's counsel presented and filed the certificate of Police Surgeon Nammack, and the affidavits of Drs. Peterson and Becker, and of relator's wife and attorney. Respondents seek to detract from the effect of Dr. Nammack's statement, because not under oath. But he was an officer of the department, amenable to its discipline, and subject to expulsion for falsehood or prevarication in his official communications with his superiors. This sanction, independently of his high character, as attested by his retention in the department, was certainly a sufficient guaranty of the truth of his statement. Dr. Becker deposed, on the 14th of August, that he was the attending physician of the relator; that he was consulted by relator on the 4th of August; that he found him then suffering from premonitory symptoms of cerebral hyperaemia, or congestion of the brain; that he had been in professional attendance on relator since the 4th of August; that he advised relator to throw aside all business, to have perfect rest and quiet, and to leave the city; that upon relator's return from Rockaway, on the 6th, he was suffering from cerebral hyperaemia; that he has visited relator every day; that relator is confined to his house and bed by illness; and that "it is impossible for him to attend to any business whatever, or to appear in court, or undergo a trial, or to consult about legal proceedings." Dr. Peterson testified that on the 14th of August he made a thorough examination of relator; that relator was "suffering from cerebral neurasthenia, severe enough to require that he be kept in perfect quiet for some weeks"; that relator was "not capable of appearing for full trial on the 15th, nor is he capable of directing or consulting with counsel." Police Surgeon Nammack gave the symptoms of relator's malady, and certified to the board that "he was mentally incapable of directing the conduct of his defense," or of performing his official duties, and that it would require "careful treatment for at least a month to restore him to health." Unless

we assume that all these gentlemen were in conspiracy to rescue relator from a trial, and to that end testified falsely, we cannot doubt that he was in a condition of physical and mental prostration which made his presence at the trial impossible.    Mr. Elkus swore to the departure of Col. James, relator's counsel, from the country on the 18th of July, and that August 15th he was on the Pacific Ocean, en route for Japan or Alaska.    The affidavit of Mrs. Devery shows that on August 13th she found "under the door" of her residence the notice of that date, requiring relator to appear for trial on the 15th; that, as advised by her husband's physician, she did not deliver the notice to relator, and that he is still ignorant of its existence and contents; that on the 10th and 11th of August she refused to allow Inspector Conlin and Drs. Hamilton and Fisher to see relator, "because he was and is too ill to do so"; and that relator "has been ill at home, and on sick leave, since about July 27th, and unable to attend to any business."    What do respondents show in justification of their refusal to adjourn the trial on the 15th of August?    First, the testimony of Supt. Byrnes that he saw the relator on the 3d of August; that relator then "looked natural"; that he saw no change in relator's appearance; that relator said on more than one occasion that "his head bothered him, and he felt kind of sick, and things like that."    Then the testimony of Sullivan, who served the notice of trial on relator, shows that he didn't look closely at relator; that he didn't notice anything unusual; that he couldn't say whether relator was in good health or not; that relator "complained"; that when he served the notice on relator the doctor, who was then present, said the relator was in no condition to assume the responsibility of accepting service of the notice. Next, Inspector Conlin details the circumstances of the attempt to see relator on the 10th and 11th of August by the persons appointed by the board to examine him, namely, that Mrs. Devery refused to let him and Drs. Hamilton and Fisher in the house, saying:    "You cannot come in.    My husband is a very sick man, My husband's life is more to me than all the rules of the department, or of the police, or anybody else."    On the morning of the 11th, Mrs. Devery again refused to admit the party—reinforced by Dr. Nammack—into the house.    That, asked by Dr. Nammack if she would not allow him, as police surgeon, to see the relator, she answered:    "No, sir; not even you.    My husband is a very sick man, and his health is dearer to me than all the police surgeons of the police department, inspectors, or anybody else."    She could have had no evil intent in denying Dr. Nammack admission, for she knew he was friendly to her husband, and had certified his illness. Next is the testimony of Louise Shilling, daughter of a hotel keeper at Rockaway, at whose house relator stopped when away from the city by command of his physician.    This witness states that "relator seemed to be well, as far as I could see; that he went to his meals, and was "around with his family, sitting on the porch, mostly."    Finally, we have the testimony of Dr. Hamilton, which consists of a criticism of Police Surgeon Nammack's report, and the avowal of an opinion that the symptoms therein detailed of re-

lator's condition were not indicative of any disability in relator to appear for trial. Against positive proof of relator's illness and incompetency by witnesses personally cognizant of his condition,—police surgeons, attending physician, and eminent specialist,—who had thoroughly examined and treated him, and who were free from interest to misrepresent, what avails the speculation of an expert who never saw the relator, and who speaks only in interpretation of hearsay indications? Of what value, as proof of the physical and mental health of the relator, is the opinion of a woman who observed him casually, and drew her inference from the circumstances that he went to the dinner table and sat on the porch? The testimony of Byrnes, Conlin, and Sullivan signifies nothing, or, if important, tends to the fact of relator's illness. Brain disease is an occult malady, except to the educated eye.

It is urged that the refusal of Mrs. Devery to admit the inspector and strange medical men into the presence of the relator is a circumstance of sinister import. But had she not been admonished by the doctor of the imperative need of repose and tranquillity to the safety of her husband? How, consistently with conjugal duty and devotion, could she permit the intrusion of these persons into the sick room of her suffering husband? She knew his critical condition, and the voice of the true wife was heard in the exclamation that: "My husband's life is worth more to me than all the rules of the department, or of the police, or anybody else." But, whatever the construction of Mrs. Devery's conduct, there is no proof in the record that the relator was aware of the presence of the party or privy to their exclusion. Moreover, afterwards, on August 14th, two police surgeons examined him, and reported him still unable to attend the trial.

Another fact counsel for respondents urges upon attention, as of evil import against the relator, which is that he accompanied his motion for an adjournment with no affidavit of his innocence. How could he? The uncontradicted proof is that he did not know of the trial. Nor was he capable of instructing counsel.

Upon a careful consideration of the case, we are of opinion that the denial of the motion for an adjournment of relator's trial, was so clearly against the weight of evidence as to involve an abuse of discretion, and so opposed to the interests of justice as to require reparation. Notwithstanding relator's creditable career in the police force,—rising from patrolman to captain, and each successive step of promotion attesting his fidelity and efficiency,—after all, he may be a guilty man. But the law knows no guilt, except as ascertained by legal means, and a conviction without trial is not a legal procedure. Assuming the guilt of the relator, still, better his escape than the overthrow of the only safeguard of innocence. Order of the board is reversed, and the relator reinstated, with costs. All concur.